IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CUNNINGHAM LINDSEY U.S., INC. and CL ACQUISITIONS HOLDINGS LIMITED, | : : : : | CIVIL NO. 1:13-CV-2528 (Chief Judge Conner) |
| **Plaintiffs** | : : | |
| v. | : : | |
| PAT BONNANI, DALE FOHL, and VERICLAIM, INC., | : : : | |
| **Defendants** | : : | |

## MEMORANDUM

Presently pending before the court is the motion (Doc. 5) for preliminary injunctive relief filed by Cunningham Lindsey U.S., Inc., and CL Acquisition Holdings Limited (collectively "Cunningham Lindsey") on October 8, 2013. For the reasons that follow, the court will deny Cunningham Lindsey's motion.

## I. Background

Cunningham Lindsey commenced this matter with the filing of a ten-count complaint (Doc. 1) on October 8, 2013. Cunningham Lindsey alleges that two of its former employees, Pat Bonanni ("Bonanni") and Dale Fohl ("Fohl"), together with officers of Vericlaim, Inc., ("Vericlaim"), implemented a scheme designed to eliminate Cunningham Lindsey's regional presence by orchestrating a mass exodus of all Cunningham Lindsey employees at its Camp Hill, Pennsylvania, office during the late summer of 2013. (See Doc. 1 at ¶ 2). Specifically, Cunningham Lindsey asserts the following claims: breach of contractual confidentiality and non-solicitation covenants against Bonanni and Fohl (Count I); breach of fiduciary duty

against Bonanni and Fohl (Count II); aiding and abetting breach of fiduciary duty against Bonanni, Fohl, and Vericlaim (Count III); misappropriation and/or misuse of trade secrets and confidential information in violation of the Pennsylvania Unfair Trade Secrets Act, 12 Pa. Cons. Stat. § 5301 et seq., against Bonanni, Fohl, and Vericlaim (Count IV); tortious interference with existing/prospective contractual and business relationships against Bonanni, Fohl, and Vericlaim (Count V); civil conspiracy against Bonanni, Fohl, and Vericlaim (Count VI); unfair competition against Bonanni, Fohl, and Vericlaim (Count VII); unjust enrichment against Bonanni, Fohl, and Vericlaim (Count VIII); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against Bonanni and Fohl (Count IX); and breach of contract for failure to pay for preference shares of CL Holdings against Fohl (Count X).

Contemporaneously with the complaint, Cunningham Lindsey filed the presently pending motion for preliminary injunctive relief (Doc. 5) and supporting documents (Docs. 6-9), asking the court to enjoin the defendants from virtually all direct and indirect competition with Cunningham Lindsey pending final resolution of this litigation. The parties fully briefed the motion (Docs. 9, 39, 44), and the court held a preliminary injunction hearing on October 31, 2013, taking evidence in the form of documentary exhibits and witness testimony. Consistent with the court's oral directive at the close of the hearing, both parties have filed proposed findings of fact and conclusions of law (Docs. 54-55) and jointly submitted relevant exhibits

and deposition transcripts. (Doc. 56). With briefing concluded and the record now closed, this matter is ripe for disposition.

**II.    Findings of Fact**[1]

Cunningham Lindsey and Vericlaim are both in the business of claims adjustment and loss management for insurers and large self-insured clients. (Doc. 40 at ¶ 25). The parties do not dispute that Cunningham Lindsey and Vericlaim directly compete with one another in this highly competitive business. (Id.) In late 2010 or early 2011, Cunningham Lindsey acquired a company known as "GAB Robins," an entity also engaged in the business of loss adjustment. (Tr. at 198:8-9, 199:2-6). Cunningham Lindsey offered employment to all GAB employees, including Bonanni and Fohl. (Tr. 94:18-24; 95:1-23; 130:1-10). Cunningham Lindsey delivered its offers of employment to Bonanni and Fohl by letter agreements with effective dates of January 1, 2011. (Ex. P-8, P-25). Each letter agreement contained the following non-solicitation provision:

> While employed by Cunningham Lindsey, and for one year after termination of my employment for whatever reason, I will not directly or indirectly solicit or recruit, nor take any action to assist any other person to solicit or recruit for employment, any employee of Cunningham Lindsey. Such assistance includes, without limitation, identifying employees of Cunningham Lindsey who have special knowledge of the trade secrets and/or business of Cunningham Lindsey. Because damages for violation of

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the evidence submitted during the preliminary injunction hearing and the parties' proposed findings of fact (Docs. 54-55).

3

> this provision would be difficult to measure, the parties
> mutually agree that if I violate this provision, I will be
> liable for liquidated damages in an amount equal to the
> annual salary of any employee as to whom I am proven
> to have violated this paragraph.

(Ex. P-8 at 2, P-25 at 2). The letter agreements also contained confidentiality provisions, as follows:

> At all times, both during and after termination of
> employment, I shall keep and retain in confidence and
> shall not disclose, except as required in the course of my
> employment with [Cunningham Lindsey], to any person,
> firm or corporation, or use for my own purposes, any
> Confidential Information. For purposes of this
> paragraph, such information shall include, but is not
> limited to, material, data, and information of
> [Cunningham Lindsey] and/or its customers or clients
> that is confidential, proprietary and/or a trade secret
> ("Confidential Information").

(Ex. P-8 at 2, P-25 at 2). Bonanni and Fohl executed their agreements on January 5 and 6, 2011, respectively. (Ex. P-8 at 2, P-25 at 2).

Fohl was eventually offered an opportunity to become a shareholder of CL Acquisition Holdings Limited ("CL Acquisitions"). On June 21, 2013, Fohl signed a Subscription Agreement providing that he would pay $50,000 in exchange for 500 preference shares of CL Acquisitions. (Ex. P-21). In addition to the provisions governing confidentiality and non-solicitation of employees, Fohl's Subscription Agreement prohibited him from soliciting Cunningham Lindsey customers for a six month period following termination for any reason. (Id. at 6). Both Bonanni and Fohl were subject to the terms of Cunningham Lindsey's non-disclosure and confidentiality policy, which defined "confidential information" to include, *inter*

4

*alia*, customer lists and preferences, financial information, compensation data, and salary information. (Ex. P-11). Fohl testified that while he disagreed with the definition of "confidential information," he understood that Cunningham Lindsey viewed these items as confidential and agreed, as a condition of his employment, to comply with the policy. (Tr. at 289:18-291:2).

The parties do not dispute that on September 5, 2013, Bonanni, Fohl, and all Cunningham Lindsey employees working at the Camp Hill, Pennsylvania, office resigned simultaneously and without notice. (Tr. at 59:18-60:3). It is not the fact of the employees' mass resignation but rather the circumstances surrounding their decisions to leave that are at issue in this litigation. The following facts which pertain to that time period are relevant to the court's analysis.

On July 30, 2013, Bonanni, Fohl, and other Cunningham Lindsey employees met with Vericlaim's chief executive officer, Thomas Simoncic ("Simoncic") and discussed the potential recruitment of all employees at Cunningham Lindsey's Camp Hill office to Vericlaim. (Tr. at 188:21-196:17 (Bonanni); 298:10-305:14 (Fohl); 327:11-331:15 (Simoncic)). During that meeting, Bonanni, Fohl, or one of two other Cunningham Lindsey employees in attendance disclosed salary information of all employees then working at Cunningham Lindsey's Camp Hill office. (Tr. at 188:21-196:17 (Bonanni); 298:10-305:14 (Fohl); 327:11-331:15 (Simoncic)). After the meeting, Simoncic documented the substance of the conversation in an email to his Vericlaim colleagues. Therein, Simoncic advised that he met with Bonanni, Fohl, and other Cunningham Lindsey employees and indicated that Bonanni and Fohl

5

"are interested in moving (at the right price) and bringing their remaining team with them," noting that this recruitment would be "all or nothing." (Hr'g Ex. 46B at 2). Simoncic testified that these demands were made during the July 30, 2013 meeting (Tr. at 327:11-329:2); Bonanni and Fohl deny making these demands to Simoncic. (See Tr. at 190:10-14 (Bonanni), 300:12-17 (Fohl)). They also deny expressing that it was an "all or nothing" deal or assisting in the recruitment of remaining adjusters from the Camp Hill office. (Id. at 189:17-21 (Bonanni), 300:12-17 (Fohl)).

At the hearing on the instant motion, Cunningham Lindsey presented evidence which indicates that in the period leading up to the mass resignation of the Camp Hill employees, Bonanni and Fohl accessed and copied or transferred a substantial volume of Cunningham Lindsey client files and information.[2] (Tr. at 12:10-13:24). On September 5, 2013, within seven minutes of one another, Bonanni, Fohl, and the remainder of Cunningham Lindsey's Camp Hill office tendered their resignations, without notice, and immediately thereafter commenced employment with Vericlaim. (Tr. at 59:18-25, 50:1-3). According to Stuart Stromeyer, a senior executive general adjuster with Cunningham Lindsey, the Camp Hill office was in a state of "disarray" when he was able to personally assess the situation on

---

[2] During the hearing, the parties disputed whether the files were accessed by Bonanni and Fohl or whether a virus scanning software may have triggered and resulted in updated access dates and times. Because this fact does not ultimately impact the court's resolution of Cunningham Lindsey's motion, the court makes no finding with respect to the testimony of the competing expert witnesses.

6

September 10, 2013. (Tr. at 134:15-136:2). The morning after the mass resignation, Cunningham Lindsey began to receive requests from clients to transfer their open claim files to Vericlaim. (Tr. at 65:4-12 (Girard), 140:17-23 (Stromeyer)). Girard testified that in total, Bonanni and Fohl took with them 109 out of Camp Hill's 143 clients, virtually decimating the Camp Hill office. (Tr. at 65:1-12).

Cunningham Lindsey's president and chief executive officer, James Girard ("Girard"), testified that he spoke with Bonanni and Fohl on September 6, 2013, the morning after the mass resignation. According to Girard, Fohl advised him that Simoncic had instigated the mass departure and had directed the group of Cunningham Lindsey employees to resign simultaneously, immediately, and without notice. (Tr. at 61:14-62:23). Fohl testified at the injunction hearing that he made no such statement to Girard. (Tr. at 275:17-23). Similarly, Bonanni testified during the injunction hearing that Girard's characterization of the September 6, 2013 telephone conversation was wholly inaccurate, and that the decision to leave without notice was his own. (Tr. at 275:7-276:1). Additionally, Simoncic testified that he never instructed Bonanni or Fohl, or any Cunningham Lindsey employee to resign. (Tr. at 314:24-315:4). For purposes of the instant motion, the court is inclined to credit Girard's testimony in light of Simoncic's email to a Vericlaim colleague immediately after his July 30 meeting with Bonanni and Fohl, wherein he indicated that he understood this to be an "all or nothing" recruitment of the remaining Cunningham Lindsey employees. (See Hr'g Ex. 46B at 2).

7

## II. **Discussion**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Resources Defense Council, 555 U.S. 7, 24 (2008). A court considering a request for preliminary injunctive relief must consider four factors: (1) whether the movant has shown that they have a reasonable probability of success on the merits of their argument; (2) whether the movant will suffer irreparable harm in the absence of relief; (3) whether granting the preliminary injunction will result in greater harm to the nonmoving party; and (4) whether the public interest favors granting the injunction. American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff, 669 F.3d 359, 366 (3d Cir. 2012). "The moving party's failure to show a likelihood of success on the merits 'must necessarily result in the denial of a preliminary injunction.'" Id. (quoting *In re* Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982)). Although these four factors must be satisfied to accord relief to Cunningham Lindsey, one of them—whether Cunningham Lindsey will suffer irreparable harm in the absence of injunctive relief—is particularly relevant to the court's ultimate ruling against Cunningham Lindsey.

As a threshold matter, the court must address whether Cunningham Lindsey has demonstrated a reasonable probability of success on the merits, as failure to satisfy this element is fatal to a plaintiff's request for injunctive relief. American Exp. Travel Related Services, 669 F.3d at 366. The crux of Cunningham Lindsey's complaint is that Bonanni and Fohl breached their employment agreements,

8

specifically the confidentiality and non-solicitation of employee provisions, and the attendant fiduciary duties associated with their employment, and that Vericlaim's officers encouraged and assisted them. The court need not determine that Cunningham Lindsey would likely succeed on *all* of its claims in order to issue injunctive relief. See, e.g., Klitzner Industries, Inc., v. H. K. James Co., 535 F. Supp. 1249, 1257-79 (E.D. Pa. Apr. 1, 1982) (issuing injunctive relief where plaintiff made requisite showing of reasonable probability of success as to copyright infringement claim despite plaintiff's failure to establish the same with respect to remaining claims). The court concludes that Cunningham Lindsey has demonstrated a likelihood of success on the merits, in particular with respect to its state law claims for civil conspiracy and breach of contractual and fiduciary duties.

Under Pennsylvania law, a breach of contract plaintiff must prove (1) the existence of a valid contractual agreement, (2) the terms of that agreements, and (3) the breach of one or more of those terms by Bonanni and Fohl. See Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003). Civil conspiracy claims require proof of: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." Chantilly Farms, Inc. v. W. Pikeland Twp., 2001 U.S. Dist. LEXIS 3328, *12 (E.D. Pa. Mar. 23, 2001) (quoting Smith v. Wagner, 588 A.2d 1308, 1311-12 (Pa. Super. Ct. 1991)); see also Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 847 (Pa. 1957) (observing that the "systematic inducing of employees to leave their present

9

employment and take worth with another is unlawful when the purpose is to cripple and destroy part of a competitive business organization. . ."). Breach of fiduciary duty claims require Cunningham Lindsey to prove that defendants "(1) negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about plaintiff's injuries." McDermott v. Party City Corp., 11 F. Supp. 2d 612, 626 n. 18 (E.D. Pa. June 30, 1998) (citation omitted). Cunningham Lindsey has demonstrated a reasonable probability of success as to each of these claims.

The evidence before the court tends to establish that Simoncic, Vericlaim's chief executive officer, worked closely with Bonanni and Fohl to orchestrate the employee and client solicitation that ultimately resulted in the mass resignation of all employees from Cunningham Lindsey's Camp Hill Office. The court notes in particular that Simoncic's email, coupled with his admission that in August of 2013, Vericlaim was still pursuing the objective of recruiting "a team of ten people" from Cunningham Lindsey to work for Vericlaim, (Tr. at 334:22-25), calls into question the defendants' position that the simultaneous resignation was a matter of coincidence. Indeed, this evidence tends to establish intent on the part of Vericlaim to recruit *all* employees from Cunningham Lindsey's Camp Hill office simultaneously. Such collective and collaborative efforts, if proven, likely satisfy the agreement, overt act, and damages aspects of the civil conspiracy claim. Further, documentary evidence and witness testimony provided at the hearing

establish that both Bonanni and Fohl were aware that Cunningham Lindsey considered salaries, client lists, and other information to be confidential, but that the two nonetheless divulged the salaries of all Camp Hill employees and other information to Simoncic during the July 30, 2013 meeting, in violation of their contracts and their fiduciary duties to their employer. Based on the factual findings rendered *supra*, the court concludes that it is reasonably likely that Cunningham Lindsey will succeed on the merits of at least some of its claims.[3]

The court acknowledges that the defendants have presented a litany of witnesses in support of their contention that the simultaneous resignation of all ten Camp Hill employees was coincidental and not the result of the coordinated efforts of Vericlaim, Bonanni, and Fohl. At this early stage of the litigation, Cunningham Lindsey need not prove by a preponderance of the evidence that the resignations or the solicitation of employees or clients were in fact the result of the coordinated efforts of defendants; it need only demonstrate a reasonable probability that what it claims is so. Conestoga Wood Specialties Corp. v. Sec'y of United States HHS, 724 F.3d 377, 397 (3d Cir. 2003) ("To demonstrate a likelihood of success on the merits, a 'plaintiff need only prove a *prima facie* case, not a certainty that he or she will

---

[3] The court does not, at this juncture, determine whether Cunningham Lindsey has proven the violations alleged in its pleading. Rather, the court holds, for purposes of resolving this motion, that it is reasonably likely, in light of the limited record before the court, that Cunningham Lindsey will succeed on the merits of at least some of its claims. Because the court will ultimately deny the pending motion on other grounds, the court need not resolve the parties' additional merits-based arguments, which are appropriately reserved for disposition in the context of defendants' pending motion to dismiss.

11

win."). After the close of discovery, it is entirely conceivable that defendants will be able to establish that the simultaneous resignation of the Camp Hill employees was mere coincidence, however catastrophic for Cunningham Lindsey—and beneficial to Vericlaim—it may have been. But, on the record as it exists today, the court finds that Cunningham Lindsey has satisfied its preliminary burden as to this aspect of our Rule 65 analysis. Ultimately, however, this victory for Cunningham Lindsey, is fleeting, because the balance of the court's analysis compels the court to deny Cunningham Lindsey's motion.

Specifically, the court concludes that Cunningham Lindsey has failed to demonstrate any ongoing irreparable harm. Cunningham Lindsey has presented substantial evidence tending to establish that it suffered significant financial and reputational harm from the apparent demise of its Camp Hill office. For example, Cunningham Lindsey's chief executive officer testified that, in the days following the resignations, numerous clients contacted Cunningham Lindsey to request that their files be transferred to Vericlaim. (Tr. at 63:21-64:9). He also testified that 109 out of 143 client files were transferred to Vericlaim. (Tr. at 65:1-12). When asked to explain the effect that the resignation had and continues to have on Cunningham Lindsey, Girard testified that it was problematic in many respects, and that Cunningham Lindsey has suffered serious reputational harm. (Tr. at 65:13-68:3).

The sticking point, however, is that there is no evidence before the court, beyond Cunningham Lindsey's own speculation, that the purported contractual violations, breaches of confidentiality, or solicitation of clients "continues to this

12

day" as alleged by counsel during the hearing on Cunningham Lindsey's motion. It is true, as Cunningham Lindsey asserts, that state and federal courts have enjoined employees from working for a competitor when they are "likely" to or there is some "threat of" their use of their former employer's confidential information. See Bimbo Bakeries USA, Inc. v. Boticella, 613 F.3d 102, 110-11 (3d Cir. 2010) ("Under Pennsylvania law, the proper inquiry in determining whether to grant an injunction to prevent the threatened disclosure of trade secrets is whether there is sufficient likelihood, or substantial threat of, a defendant disclosing trade secrets."); also A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936, 939 (Pa. Super. Ct. 2000). However, Girard admitted during the preliminary injunction proceeding that he has no knowledge of any ongoing confidentiality violations, attempts, or threatened attempts by Fohl, Bonanni, or Vericlaim to solicit Cunningham Lindsey employees, nor is he aware of pricing information or other alleged trade secrets being shared by the defendants. (Tr. at 98:25-99:18, 101:5-22, 102:11-15). Thus, Girard's own testimony seals Cunningham Lindsey's fate: while Cunningham Lindsey likely suffered some injury, there is no continuing behavior or action that this court can effectively remedy with preliminary injunctive relief.

The court is also compelled to reject Cunningham Lindsey's argument that its customers' loss of confidence in the Cunningham Lindsey name and potential losses of customers in the future constitute irreparable harm that cannot be addressed by compensatory damages. This court has previously rejected that position, see, e.g., Mettler-Toledo, Inc. v. Acker, 908 F. Supp. 240, 248 (M.D. Pa.

13

Nov. 21, 1995) (noting that when concern was that "customers will shift their business from [plaintiff] to [defendant] during the pendency" of the action, monetary damages flowing from that injury could be calculated at the end of trial), and absent compelling argument from Cunningham Lindsey, the court does so again today. Cunningham Lindsey contends that issuance of an injunction would return the parties to equal footing, but this is not the purpose of the relief offered by Rule 65. Injunctive relief is not designed to "turn back the clock" or to allow a plaintiff to "seek correction of past wrongs." First Health Group Corp. v. Nat'll Prescription Adm'rs, Inc., 155 F. Supp. 2d 194, 235-36 (M.D. Pa. July 19, 2001) ("Any irreparable harm alleged by [plaintiffs] must be *prospective*." (emphasis added)).

In sum, Cunningham Lindsey has not demonstrated irreparable harm. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989) ("In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following trial."). Based upon the present record, the court cannot conclude that defendants' unlawful actions and Cunningham Lindsey's irreparable injuries are extant. Under the circumstances, the appropriate resolution of these claims must await a trial on the merits.

**III. Conclusion**

For the reasons articulated above, the court will deny Cunningham Lindsey's motion (Doc. 5) for preliminary injunctive relief. An appropriate order follows.

      /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      November 19, 2013